**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANIL GOYAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 05 C 5069 |
| | ) |
| GAS TECHNOLOGY INSTITUTE, an | ) Judge Rebecca R. Pallmeyer |
| Illinois Corporation, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Anil Goyal was employed as a chemical engineer by Defendant Gas Technology

Institute ("GTI") from 1977 until 2004. He brought this suit against GTI, alleging that he was fired

in retaliation for blowing the whistle on a fraud committed by former high-level employees of

Defendant. Plaintiff was hired by GTI's corporate predecessor in 1977 and continued to work for

GTI or its subsidiary, Endesco Services, Inc. ("Endesco"), until he was suspended on September

4, 2003. Six months later, on March 9, 2004, GTI terminated his employment. Nearly a year before

his suspension, on October 17, 2002, Plaintiff reported to John Riordan, the President of GTI, that

two GTI employees had defrauded the company by funneling over $4 million of federal funds

designated for research by Endesco to sham contractors. Following an investigation of Plaintiff's

allegations, the two employees–Tony Lee and Peter Barone–were terminated by GTI on January

9, 2003. The Lee/Barone fraud has generated additional civil litigation between GTI and other

business entities, as well as a federal indictment against Lee, Barone, and a third GTI employee,

Amir Rehmat. Plaintiff's two-count complaint states both federal and state causes of action for

retaliatory discharge, claiming that his suspension and ultimate termination from GTI were in

retaliation for his whistle-blowing.

Defendant moved for summary judgment on both counts, claiming that it had valid, non-

pretextual reasons for terminating Plaintiff. Defendant claims that Plaintiff was increasingly a

source of problems within the organization and further alleges that Plaintiff had improperly received refunds for travel expenses he had not actually incurred.[1] The court finds that genuine issues of material fact exist as to whether Plaintiff has established a prima facie case and whether Defendant's offered reasons were pretextual, and therefore denies the motion for summary judgment.

## **DISCUSSION**

The elements of Plaintiff's two claims for relief are substantially overlapping. To establish a violation under the False Claims Act (31 U.S.C. § 3730(h)), a plaintiff must show that (1) he was engaged in activity protected by the statute; (2) the employer knew he was engaged in such conduct; and (3) the discharge was at least partially motivated by a desire to retaliate. *See Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 944 (7th Cir. 2002). Similarly, to establish a claim for retaliatory discharge under Illinois law, a plaintiff must prove that (1) he has been discharged; (2) the discharge was in retaliation for his activities; and (3) the discharge violates a clear mandate of public policy. *See Webber v. Wight & Co.*, 368 Ill. App. 3d 1007, 1021, 858 N.E.2d 579, 592 (1st Dist. 2006). For purposes of this motion, Defendant has not challenged Plaintiff's assertion that his reporting of Lee's and Barone's misconduct constitutes protected activity. Defendant argues, however, that no reasonable jury could find that it terminated Goyal in retaliation for that activity.

To defeat summary judgment on a claim for retaliation, a plaintiff must demonstrate that there are disputes of fact concerning the reasons for his termination, either by way of the direct method or the indirect method. *See, e.g.*, *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). Goyal here proceeds only under the indirect method, under which he must establish a prima facie case supporting an inference of retaliation. Defendant can defeat the

---

[1]     GTI has filed a counterclaim seeking repayment of these funds, but the counterclaim is not before the court on this motion.

inference by offering a legitimate, non-retaliatory reason for the discharge. Goyal then bears the burden of proving that GTI's purported reasons are in fact pretexts for retaliation.

## I. The Prima Facie Case

For the purposes of this motion, Defendant concedes that Goyal's reports of Barone's and Lee's wrongdoing were protected activity, and that Goyal was terminated. GTI nevertheless challenges Goyal's prima facie showing, arguing that Goyal has not demonstrated that he was performing satisfactorily, nor has he offered evidence of any similarly situated employee treated more favorably than he.

### A. Goyal's Performance

Far from performing adequately after he reported the Lee/Barone fraud, GTI argues, Plaintiff became a "prickly, pushy, paranoid employee who believed he could behave in any manner he wanted . . . and then hide behind the fact that he had blown the whistle on the . . . fraud to avoid the consequences of his own behavior." (GTI's Reply to Pl.'s Resp. at 9.) Starting in the mid-1990s, Goyal worked on several projects involving a technology known as "Cement-Lock," which is a process that converts contaminated material into an environmentally safe end-product that can be used as an additive in materials such as cement. (GTI 56.1 ¶ 4.) As its first complaint regarding Goyal's behavior, GTI points to reports in the Fall of 2002, from Lee and Barone that Plaintiff was difficult to supervise and disruptive.[2] (*Id.* ¶ 10.) As noted earlier, Lee and Barone were fired in January 2003 for their participation in the fraud that Plaintiff reported – a scheme that consisted of funneling millions of dollars to subcontractors who kept 10% of the money and kicked back the rest to Lee, Barone, and/or Rehmat. (*Id.* ¶ 75.) Francis Lau assumed control over the Cement-Lock project in January 2003, after Lee and Barone were removed. (*Id.* ¶ 19.) From the time Lau took charge until Plaintiff's suspension that September, Lau and others claim to have experienced

---

[2]       Plaintiff disputes whether Lee was in fact his supervisor at the time. (Pl.'s Resp. ¶ 9.)

continued problems with Plaintiff. The problems identified by Lau and others include his constant belittling of another chemical engineer (Michael Mensinger), interrupting others while they spoke at team meetings, and otherwise failing to interact constructively with colleagues and superiors. (*See id.* ¶¶ 18-36.) For example, at one specific meeting with an outside Cement-Lock project partner, Anderson 2000, Goyal allegedly refused to act with "professionalism and tact" and instead was "rude, accusatory and belligerent." (*Id.* ¶ 22.)

Plaintiff generally disputes these characterizations of his interactions with others, and states that the Anderson 2000 meeting was "contentious from the inception" because GTI was demanding payment from Anderson to fix errors it had made during the project. (Pl.'s Resp. ¶ 22.) Plaintiff does concede, however, that there was tension between his colleagues and himself at this time. Goyal attributes the tention to the pressure that GTI management imposed on him to keep the Cement-Lock project moving on schedule. According to Goyal, Lau had told him that he would be held personally accountable for keeping the entire team on schedule. As a result, Goyal claims, his coworkers "resented [Goyal's] prodding, and began to complain that he was difficult to work with, opinionated and rude for calling them on the carpet when their work was shoddy." (Pl.'s Resp. to Mot. for Summ. J. at 4.) From Goyal's perspective, the complaints from his colleagues were solely the product of his insistence on meeting deadlines and holding them accountable for untimely or low quality work. (*Id.*)

On June 20, 2003, Lau asked Barbara Weber, Director of Human Resources at GTI during this time, to remove Goyal from the project. (Lau Aff. ¶ 33, Ex. 9 to GTI 56.1.) Weber suggested counseling Plaintiff about his interpersonal problems instead of outright removal. (*Id.* ¶ 34.) On June 27, 2003, Lau, Weber, and Jim Dunne, GTI's CFO, met with Goyal and presented him with his annual performance review and a "Final Written Warning." (Exs. I & J to Lau Aff., Ex 9 to GTI 56.1.) The performance review rated Goyal at 2.7 out of 10, including a 1 out of 10 on "Organizational Contributions," a category which included the subcategory of interpersonal

relationships. (Ex. I to Lau Aff., Ex. 9 to GTI 56.1.) Plaintiff disagreed with the criticism and also made further allegations of wrongdoing at GTI (neither party identifies the precise nature of these allegations). (GTI 56.1 ¶¶ 47, 52, 54.) Defendant retained the law firm of Greenberg Traurig as an outside consultant to investigate Plaintiff's allegations, but the fim ultimately found no evidence to support them. (Riordan Aff. ¶ 22, 24, Ex. 7 to GTI 56.1.) GTI contends that Goyal's inappropriate behavior continued, and he was therefore suspended in September 2003. After attempts to work out an agreeable severance package failed, Goyal was terminated on March 9, 2004. (GTI 56.1 ¶ 74.)

Plaintiff responds to these accusations by claiming that the alleged interpersonal problems were merely pretext for Defendant's actual, retaliatory motive. As proof, Plaintiff relies principally on his past performance reviews with GTI and Endesco over the prior two decades, all of which were generally positive and all of which were completed prior to his whistle-blowing activities. Plaintiff's most recent evaluation prior to his 2003 evaluation–completed by Barone–rated him at 5.9 out of 10, stated that he was "truly an asset for Endesco: technically astute, hardworking, and loyal," and listed no areas needing improvement. (Ex. 10 to Pl.'s Statement of Add'l Facts, at GTI 102.) Other scores on his prior evaluations were consistently between 7 and 8; from 1996 through 2000, his scores ranged from 7.0 to 7.5. (*Id.* at GTI 103-124.) Written comments concerning his performance were likewise consistently positive, including those relating to interpersonal relationships. The most negative comment Goyal received on that score was back in 1987, when Rehmat, his evaluator that year, wrote, "Anil should be more cooperative with other coworkers in helping with his technical knowledge." (*Id.* at GTI 133.) Even this comment was not harsh, and and Plaintiff still received a 6 out of 10 in the personal relations category. More common are comments like "excellent management skills"; "works well with subordinates"; "interacts well with subordinates"; and "maintains excellent rapport with clients." (*Id.* at GTI 103-141.) The evaluation forms contain an entire field dedicated to improvements the employee could make, but with the

1987 exception noted above, they make no mention of any need for Goyal to improve his interpersonal relationship skills.[3]

The court further notes that the initial complaint in this series of events regarding Plaintiff's interpersonal skills was made by Lee. After another complaint by Lee, a group met on October 16, 2002 to discuss Goyal's problems. It was Lee and Barone who discussed their problems with Goyal at that meeting. (GTI 56.1 ¶ 10.) The next day, Goyal met with Riordan and implicated Lee and Barone in a fraud. (*Id.* ¶ 11.) Other than this complaint by Lee and Barone, the record contains no evidence of unsatisfactory performance by Plaintiff prior to his report of the Lee/Barone fraud. There is no indication that, at the time of the October 16, 2002 meeting, Lee and Barone knew that Goyal planned to disclose their wrongdoing the next day. Still, the court concludes that the circumstantial evidence of Plaintiff's past positive evaluations and the failure of anyone other than Lee or Barone to complain about Plaintiff prior to his reporting the fraud creates a genuine issue of material fact as to whether he was performing his job adequately at the time he was suspended.

### B.    Similarly Situated Employee

As noted above, GTI not only challenges Goyal's ability to demonstrate satisfactory performances, but also contends that Goyal cannot identify any similarly-situated employee treated more favorably than he. In response, Goyal identifies Michael Mensinger who, like Goyal, was a chemical engineer working on the Cement-Lock project for Endesco. (*Id.* ¶ 5.) Plaintiff points to two areas in which they were similarly situated but ultimately treated differently.

First, Plaintiff suggests that similar evidence existed for both Mensinger and himself that improper reporting of travel expenses occurred, but that he was the only one subjected to adverse treatment. To support this claim, Goyal points to a spreadsheet prepared by GTI auditor Mike Isaac

---

[3]        The 1997 evaluation does state that Goyal "demonstrated significant improvement" in the "Interpersonal Relations" category (Ex. 10 to Pl.'s Statement of Add'l Facts at GTI 107), but there appear to be no other performance reviews prior to 1997 suggesting that that area needed improvement.

in November 2003. Entitled "Internal Compliance Review," the spreadsheet tracks airfare tickets purchased at Ascon Travel by Rehmat, Goyal, and Mensinger.[4] (Ex. 10 to Pl.'s Statement of Add'l Facts, at GTI 3775-79.) Several columns on the spreadsheet are devoted to calculating loss amounts, although it is not entirely clear what those loss figures represent. Isaac stated that he did not remember if this was an actual loss or some "internal type of calculation."[5] (Isaac Dep. 237:17-20, Ex. 2 to Pl.'s Statement of Add'l Facts.) Isaac later explained that at least some of the figures on the spreadsheet simply reflected an internal loss that was not an actual loss to GTI. (Pl.'s Statement of Add'l Facts ¶ 32; Isaac Dep. 241:19-22, Ex. 2 to Pl.'s Statement of Add'l Facts.) In his affidavit, Isaac states that he determined that "Mensginer had not received a refund for any of the tickets he had submitted for reimbursement" because Mensinger purchased his tickets with a company credit card. But Isaac could not explain why the spreadsheet he had prepared nevertheless reflected "loss amounts" for Mensinger. (Isaac Aff. ¶ 14, Ex.12 to GTI 56.1.) This constitutes relevant circumstantial evidence that might indicate Plaintiff was treated differently from a similarly-situated employee.

Plaintiff also argues that Mensinger was receiving negative reviews in 2003, just as Plaintiff was. Barbara Weber, Director of Human Resources at GTI during 2002 and 2003, stated that Lau, who was both Mensinger's and Plaintiff's supervisor, was not satisfied with Mensinger's work. (Weber Dep. at 146:2-3, Ex. 5 to GTI 56.1.) Weber also recalled that Mensinger's 2003 evaluation was approximately as low as Plaintiff's was. (*Id.* at 146:4-5.) These two similarities give rise to a reasonable inference that Plaintiff was similarly situated to Mensinger, but subjected to disparate treatment, and that Plaintiff has therefore established his prima facie case.

---

[4] The spreadsheet indicates that it was prepared "at the direction of counsel." (Ex. 10 to Pl.'s Statement of Add'l Facts, at GTI 3775.)

[5] *See also* Isaac Dep. 239:14-18, Ex. 2 to Pl.'s Statement of Add'l Facts ("Q: To your understanding is this calculated total loss amount something that is supposed to be reflected of an actual cash loss to the company? A: I'm not sure.").

## II. Pretext

### A. Performance Issues

The 2003 evaluation–in which Goyal was rated at 2.7 out of 10–was a drastic departure from his prior evaluations. Goyal contends that a reasonable finder of fact could find this dramatic change in GTI's evaluation was a pretext to justify Goyal's firing. Defendant does not point to any complaints regarding Plaintiff's performance prior to his disclosure of the Lee and Barone fraud, the one exception being the complaints raised by Lee and Barone themselves. A reasonable factfinder could find, however, that Lee and Barone might have entertained concerns about the possibility that Plaintiff might uncover and disclose their activities: according to Goyal, Lee and Barone had previously approached him and invited them to participate in the fraud with them. (Pl.'s Statement of Add'l Facts ¶ 2.) This court, of course, makes no determination that Lee and Barone were so motivated–that question is for a factfinder. But, given the timing of the complaints leveled against Plaintiff after he had worked for Defendant for over twenty-five years and the incongruity of the complaints with past performance evaluations, Plaintiff has introduced enough evidence to create a genuine issue of material fact as to whether this was a pretextual reason for Plaintiff's termination.

### B. "Travel Fraud"

Defendant claims that Plaintiff's termination was also motivated by the non-pretextual reason that Plaintiff had engaged in fraudulent reimbursement practices. In late October 2002, after Plaintiff had spoken to Riordan and identified Lee and Barone in a fraudulent scheme, CFO Jim Dunne received an anonymous note suggesting that Plaintiff had submitted reimbursement claims for travel expenses he had not actually incurred.[6] Isaac looked into the matter further and found that some of Plaintiff's reported expenses had been improperly refunded (Dunne Aff. ¶ 13, Ex. 4

---

[6] The parties dispute whether the note was truly anonymous. GTI contends that Barone submitted the note (Resp. to Pl.'s Revised Statement ¶ 25), while Goyal points to the fact that Barone denied, under oath, submitting the note, and alleges that GTI fabricated it. (Pl.'s Resp. ¶ 64.)

to GTI 56.1), the very issue that had caused another GTI employee, Amir Rehmat, to be terminated in January 2002. (GTI 56.1 ¶ 69.) Significantly, however, Dunne took no further action on this matter further until June 2003, after the reports of Plaintiff's alleged interpersonal problems started to emerge. (GTI 56.1 ¶ 65.) Defendant explains that no action was taken on the matter for nearly eight months was because GTI was focusing upon the Lee and Barone fraud. (Dunne Aff. ¶¶ 12-13, Ex. 4 to GTI 56.1.) In a meeting on September 2, 2003, Isaac claims that Plaintiff admitted that he "cheated" on three tickets, although Plaintiff steadfastly denies having made any such statement. (Isaac Dep. 136:24-137:3, Ex. 2 to Pl.'s Statement of Add'l Facts; Goyal Dep. 288:24-289:2, Ex. 1 to GTI 56.1.) Plaintiff does concede that he was reimbursed by Defendant for the cost of two tickets for which he in fact used his frequent flier miles (rather than paying for them), and one additional refund for a ticket to which he applied a $450 United Airlines travel voucher.[7] (Pl.'s Statement of Add'l Facts ¶ 29.) Plaintiff claims he received approval to do this from Ken Wicherek, the Treasurer at both GTI and Endesco (Wicherek denies this). (Wicherek Aff. ¶ 4, Ex. 8 to GTI 56.1.) At the September 2 meeting, Plaintiff claims that he told Isaac that he would reimburse GTI for tickets for which "he agreed there was any problem" (Pl.'s Resp. ¶ 71); according to GTI, Plaintiff told Isaac that he would reimburse GTI for approximately $2,700. (GTI 56.1 ¶ 71.) Plaintiff was suspended two days later, and did not return to work prior to his March 9, 2004 termination. (*Id.* ¶ 74.)

Evidence of the timing surrounding an employer's actions is probative of whether the employer acted with a retaliatory motive. "Suspicious timing may permit a plaintiff to survive summary judgment if there is other evidence that supports the inference of a causal link."[8] *Culver*

_____

[7] Defendant suggests that Plaintiff's misconduct extended beyond these three tickets. (Resp. to Pl.'s Revised Statement ¶ 28).

[8] Such a lengthy period of time between the whistle-blowing and the alleged retaliatory act is ordinarily evidence that militates aganist a finding of retaliation. Suspicious timing can,
(continued...)

*v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005). Here, Plaintiff was alleged with wrongdoing in October 2002, and Dunne was presented with some evidence the next month by Isaac that there may be some merit to the allegations. (GTI 56.1 ¶ 64.) Neither Dunne nor anyone else pursued the issue any further for nearly eight months, however, despite the fact that Rehmat had been fired earlier that year for similar conduct. The odd timing of the larger investigation into travel improprieties does not by itself establish that Defendant's rationale was pretextual. The court can, however, consider this evidence in conjunction with other circumstantial evidence–including the drastic change in Plaintiff's performance evaluations and the similarities between Plaintiff and Mensinger–in considering whether this rationale for Plaintiff's firing was also a pretext. *See Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). A reasonable jury could conclude, based on the totality of evidence presented, that Defendant was in fact not concerned by the alleged travel improprieties but merely resurrected this issue several months later when Defendant felt safe in retaliating against Plaintiff for his whistle-blowing. Certainly, this is not the only reasonable inference one could draw from the evidence presented, but at the summary judgment stage, the court must draw every reasonable inference in favor of the non-moving party. *See Springer v. Durflinger*, 518 F.3d 479, 483-84 (7th Cir. 2008).

## **CONCLUSION**

For the reasons stated above, Defendant's motion for summary judgment [113] is denied.

ENTER:

Dated:   September 23, 2008

_____
REBECCA R. PALLMEYER
United States District Judge

---

[8](...continued)
however, be circumstantial evidence for a number of different purposes.