

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANIL GOYAL,                        )
                                   )   No. 05 C 5069
                Plaintiff,         )
                                   )   Judge Rebecca R Pallmeyer
        V.                         )
                                   )   Magistrate Judge Arlander Keys
GAS TECHNOLOGY INSTITUTE,          )
                                   )
                Defendant.         )

**MEMORANDUM OPINION AND ORDER**

In September 2005, Plaintiff Anil Goyal filed suit against
Defendant Gas Technology Institute ("GTI"), alleging that GTI
fired him in retaliation for blowing the whistle on a fraud
committed by his superiors.  On March 21, 2006, Mr. Goyal
retained the law firm of Childress Duffy Goldblatt, Ltd. ("CDG")
to represent him in the lawsuit.  Following several failed
settlement attempts, on December 23, 2008 Judge Rebecca Pallmeyer
granted CDG leave to withdraw as Mr. Goyal's attorney.
Representing himself, Mr. Goyal reached a settlement agreement
with GTI in April 2009.

Following its withdrawal from the case, CDG notified Mr.
Goyal on April 8, 2008, that it claimed an attorney's lien
against any settlement or judgment paid as a result of his claim
against GTI.  Mr. Goyal and GTI subsequently filed an agreed
motion to quash the attorney's lien, arguing that CDG had failed
to perfect a lien under the Illinois Attorney's Lien Act, 770
ILCS 5/1 (2003).  Judge Pallmeyer denied the motion to quash,

finding that the language in the fee agreement between CDG and
Mr. Goyal gave rise to an equitable lien.[1]  CDG then filed a
motion to enforce the equitable lien, arguing that, under the
terms of the fee agreement, it is entitled to reasonable
attorneys' fees.  The Court grants CDG's motion.

### BACKGROUND

In October 2002, Plaintiff Anil Goyal provided the CEO of
GTI with substantial evidence of a fraud committed by two of Mr.
Goyal's superiors.  Mr. Goyal also disclosed his belief that
certain members of upper-level management were involved in the
fraud.  Soon thereafter, Mr. Goyal began receiving unfavorable
performance reviews, which were inconsistent with the favorable
reviews he had received since the beginning of his employment in
1977.  GTI suspended Mr. Goyal in September 2003 and terminated
his employment in March 2004.

In the months following his suspension from GTI, Mr. Goyal
first attempted to settle his dispute with GTI by participating
in company-sponsored mediation sessions.  During one of these
mediation sessions, Mr. Goyal made a settlement demand of $2
million.  In April 2004, GTI offered Mr. Goyal $550,000, which
Mr. Goyal declined.

In September 2005, Mr. Goyal filed a two-count complaint

---

[1]Judge Pallmeyer noted that the CDG attorney "has conceded that
he did not perfect a lien as required under the [Act]."  Doc. 210.
Therefore, only enforcement of the equitable lien is at issue here.

2

against GTI alleging retaliatory discharge in violation of the
False Claims Act, 31 U.S.C. § 3730(h), and in violation of
Illinois law.  On March 21, 2006, Mr. Goyal retained CDG to
represent him.  Initially, CDG attorneys Roy Brandys and Ryan
Haas handled Mr. Goyal's case.  However, after Mr. Brandys moved
to Texas in October 2006 and Mr. Haas left the firm in March
2007, CDG transferred Mr. Goyal's case to CDG attorneys
Christopher Mammel and Victor Jacobellis.

The March 21, 2006, fee agreement between Mr. Goyal and CDG
provided that Mr. Goyal was to pay attorneys fees on a
contingency basis, plus costs.  The contingency fee was to be
twenty-five percent of any amounts recovered by Mr. Goyal,
through settlement or otherwise.  The fee agreement contained
several provisions relevant here; first, it instructed Mr. Goyal
that "[o]ne of your most important obligations under this
contract is not to unreasonably withhold your consent to a
settlement."  In addition, the agreement stated:

> Should it become necessary for us to withdraw as a result of
> your conduct, you agree to reimburse all expenses and costs
> we have advanced or obligated the firm to pay on your
> behalf, and to pay for the reasonable value of our legal
> services up to the time of withdraw, and you hereby grant us
> a lien on your case in that amount.

Finally, the agreement stated:

> In the event the firm withdraws because it believes your
> case would not result in a sustainable claim and/or
> collectible judgment or for any other reason, you agree to
> reimburse the firm all costs and expenses advanced on your
> behalf or obligated to pay on your behalf but no attorneys

3

fees.

Christopher Mammel's attempts to settle Mr. Goyal's case began with a February 20, 2008, letter to GTI demanding $4 million. Prior to issuing the letter, Mr. Mammel had several e-mail exchanges with Mr. Goyal to determine an agreeable settlement demand. In an e-mail dated December 19, 2007, Mr. Goyal asked Mr. Mammel for his minimum, most likely, and maximum jury award estimates, were the case to proceed to trial. In an e-mail dated February 19, 2008, Mr. Mammel responded that the worst-case scenario would be to be awarded nothing and to be found liable on a counterclaim; the most likely scenario would be to be awarded double back pay up to the date of trial[2], plus two years of front pay, plus interest and attorneys' fees, totaling about $2.25 million; and the best-case scenario would be to be awarded double back pay up to the date of trial, five years of front pay, plus the value of Mr. Goyal's Retiree Medical Benefit, plus interest and fees, totaling about $4.14 million. In the same e-mail, Mr. Mammel informed Mr. Goyal that the best-case scenario was "not likely," and that the "uncertainty" of the most likely scenario was "still troubling." Finally, Mr. Mammel recommended that Mr. Goyal be willing to settle the case for $1 million, because the "likelihood that you get $2,000,000 in your

---

[2] Under the False Claims Act, meritorious plaintiffs are entitled to double back pay.

pocket is very low."

During subsequent e-mails, Mr. Goyal made clear the amount he wanted to demand in settlement. In an e-mail dated February 20, 2008, Mr. Goyal responded that he wanted $2.25 million "in my pocket," exclusive of CDG's fees and exclusive of his former attorneys' fees. By Mr. Goyal's calculations, he needed to settle for between $3 and $3.9 million to retain the desired amount. That day, after communicating to Mr. Goyal his disapproval of the high figure, Mr. Mammel sent a $4 million settlement demand to GTI.

Just over two weeks later, on March 7, 2008, the parties participated in their first settlement conference before this Court. At the conference, GTI offered Mr. Goyal $91,000 to settle the case. Not surprisingly, Mr. Goyal declined the offer; however, he walked away from the conference with what in his mind must have been a silver bullet, which he would later use to justify higher and higher settlement demands; that silver bullet was this: after noting what a gamble going to trial can be, and in response to Mr. Goyal's suggestion that the case could be worth up to $10 million, the Court agreed that a jury could award even $10 million in a best-case-scenario whistleblower case.[3]

---

[3] Of course, in discussing the alternative side of the gamble, this Court had informed Mr. Goyal that he could also walk away from trial empty-handed. In addition, this Court emphasized the low probability of a $10 million award and told Mr. Goyal that an award that large could be remitted.

5

Mr. Goyal seized upon this.

Afer the failed settlement conference, the parties ceased settlement negotiations until October 2008, by which time Judge Pallmeyer had denied GTI's motion for summary judgment. Mr. Goyal and Mr. Mammel resumed discussing settlement figures on October 6, 2008. That morning, Mr. Goyal e-mailed Mr. Mammel and informed him that he planned to raise his settlement demand from the February 20, 2008, $4 million figure.[4] Mr. Goyal cited the summary judgment outcome and a recent favorable deposition as his justification for raising the demand. In his response e-mail that same day, Mr. Mammel counseled Mr. Goyal against raising his demand. Mr. Mammel told Mr. Goyal that he continued to disagree with the $4 million figure, because it substantially exceeded Mr. Goyal's actual damages. In what would be a recurring theme, Mr. Mammel also expressed his concern that Mr. Goyal was calculating his demand based upon the amount he wanted to end up with, rather than calculating his demand based upon GTI's legal liability. In response, Mr. Goyal accused Mr. Mammel of, among other things, ignoring this Court's comment that he could get $10 million out of his case.

In late October 2008, after numerous e-mails and a two-hour phone call, Mr. Goyal and Mr. Mammel appeared to be nearing

---

[4] In an e-mail dated October 19, 2008, Mr. Goyal stated that he wanted $2.75 "in my pocket," which he calculated as requiring a settlement demand of $4.6 million.

common ground.   Consistent with his belief that Mr. Goyal's
settlement demands were unreasonably high (and getting higher),
Mr. Mammel offered to reduce CDG's attorneys fees to $250,000 if
Mr. Goyal would reduce his settlement demand to $2.6 million.   On
November 7, 2008, Mr. Mammel tendered to Mr. Goyal a single-page
modification of the March 21, 2006, fee agreement.   The
modification outlined the reduction in  attorneys fees in
exchange for the reduced settlement demand, and provided that the
March 21 fee agreement would otherwise remain unchanged.
Unsatisfied, Mr. Goyal responded in an e-mail dated October 20,
2008, that the simple modification was insufficient and requested
that Mr. Mammel draft a "stand-alone" document that included
several other provisions, including a modification of Mr. Goyal's
liability for attorneys fees should CDG withdraw from the case.[5]
In an e-mail dated November 7, 2008, after Mr. Mammel declined to
make any changes, Mr. Goyal rejected the modification.

Over the next month, the communications between Mr. Goyal
and Mr. Mammel grew more strained.   In an e-mail dated November
12, 2008, Mr. Goyal informed Mr. Mammel that $4.6 million was "at

---

[5] Mr. Goyal wanted the following provision included: "If CDG
withdraws from the case prior to trial without a written mutual
agreement then CDG will not use any offer or counteroffer made by GTI
after the date this agreement is signed to claim its share.   CDG
agrees that if CDG withdraws from this case voluntarily without a
mutual agreement after the date this amendment to the agreement is
signed then CDG's share would be strictly based on the original
agreement signed between the parties on or about March 21, 2006, which
is $0.0 (zero dollars), and the other relevant conditions of the
original contract will apply."

the low end of my expectation." Mr. Goyal also reminded Mr. Mammel that his demand was "still less than 50% of what the Magistrate Judge stated that I could potentially get." Then, on November 17, 2008, came the straw that broke the camel's back. In an e-mail labeled "URGENT and IMPORTANT," Mr. Goyal requested that Mr. Mammel "IMMEDIATELY inform GTI that my demand is $5.5 million now." Shocked that Mr. Goyal would raise his demand just weeks after the two had discussed lowering his demand to $2.6 million, Mr. Mammel expressed his concern in an e-mail the same day that the higher demand was merely an attempt to extort GTI. In a long e-mail dated November 18, 2008, Mr. Goyal denied extorting GTI and responded that his higher demand was based upon the lost royalty income he had decided to include in his settlement-demand calculations.[6] Rather than prolonging the debate, Mr. Mammel submitted the $5.5 million settlement demand to GTI on November 26, 2008.

The parties participated in their second settlement conference before this Court on December 3, 2008. Prior to the conference, GTI had responded to Mr. Goyal's $5.5 million demand with an offer of $750,000. At the conference, this Court

---

[6] Prior to his discharge from GTI, Mr. Goyal received a royalty for his part in developing the Cement-Lock technology. Although Mr. Goyal estimated that his royalty income could have been up to $2.4 million per year, the royalty is no longer viable because Cement-Lock technology is no longer being marketed. *See* Pl.'s Settlement Demand Letter, Feb. 20, 2008, p. 17.

attempted to aid settlement negotiations by recommending a settlement figure of $1.6 million. Both Mr. Goyal and GTI rejected the figure.

The next day, December 4, 2008, GTI tendered to Mr. Goyal and CDG an Offer of Judgment of $1 million, inclusive of attorney's fees. In their e-mail exchange following receipt of the offer, Mr. Mammel and Mr. Goyal made clear the deterioration of their attorney-client relationship. In an e-mail dated December 6, 2008, Mr. Mammel recommended that he and Mr. Goyal discuss a potential counteroffer. In an e-mail later that morning, Mr. Goyal asked what amount Mr. Mammel recommended for a counter. Mr. Mammel responded that afternoon that he had not decided what to recommend yet, but that he was "interested to understand [Mr. Goyal's] thinking." In an e-mail that evening, Mr. Goyal responded: "I want $3 million in my pocket and this has not changed."

Two days later, in an e-mail dated December 8, 2008, Mr. Goyal again asked Mr. Mammel if he recommended any amount for a counteroffer. Mr. Mammel told Mr. Goyal in an e-mail the next day that he didn't understand Mr. Goyal's settlement strategy or goals, and "[s]ince you are not consulting me on any of these issues, I cannot recommend a settlement counteroffer." In a multi-page response e-mail dated December 10, 2008, Mr. Goyal told Mr. Mammel that his settlement goal was clear—he wanted $3

million "in my pocket"–and he would accept any settlement strategy that got him that amount. In addition, he again referenced the "$10 million Judge Keys thought I could get." Finally, he criticized Mr. Mammel's handling of the case, concluding that Mr. Mammel could not "comprehend the whole case," that he had missed many opportunities, and that "we will have to go to trial to compensate for those missed opportunities." In an e-mail dated December 11, 2008, Mr. Mammel informed Mr. Goyal that he intended to withdraw from the case, citing the "adversity evident in your communications [that] creates an untenable conflict of interests between you and the firm."

On December 23, 2008, Judge Pallmeyer granted CDG's motion for leave to withdraw from the case. A few months later, in April 2009, Mr. Goyal settled his case with GTI for $1.3 million. Shortly thereafter, CDG notified Mr. Goyal that it claimed an attorney's lien against any settlement or judgment that Mr. Goyal received. Mr. Goyal and GTI filed an agreed motion to quash the attorney's lien, and on June 22, 2009, Judge Pallmeyer held that the language of the fee agreement between CDG and Mr. Goyal gave rise to an equitable lien. Before the Court is CDG's motion to enforce the equitable lien.

## DISCUSSION

### I.  Language that Gives Rise to an Equitable Lien

Under Illinois law, a fee agreement between an attorney and client gives rise to an equitable lien where the agreement "makes an equitable assignment of a portion" of a fund.  *E.g., Home Fed. Sav. and Loan Ass'n of Centralia v. Cook*, 525 N.E.2d 151, 153 (Ill. App. Ct. 1988).  However, an equitable assignment of a portion of a fund is distinct from a mere promise to pay, which does not create an equitable lien.   *Wegner v. Arnold*, 713 N.E.2d 247, 252 (Ill. App. Ct. 1999); *compare Dep't of Public Works of Ill. v. Exch. Nat'l Bank*, 417 N.E.2d 1045, 1048-49 (Ill. App. Ct. 1981) (contract provision stating "we hereby agree to pay you . . . an amount equal to [28% of recovery over $132,200.00]" was mere promise to pay); *with Home Fed. Sav. and Loan Ass'n of Centralia*, 525 N.E.2d at 154 (contract provision stating "we agree to pay . . . a contingent fee of 40%" was an equitable assignment).

Here, the language in the fee agreement between Mr. Goyal and CDG that gives rise to an equitable lien is the following:

> Should it become necessary for us to withdraw as a result of
> your conduct, you agree to reimburse all expenses and costs
> we have advanced or obligated the firm to pay on your
> behalf, and to pay for the reasonable value of our legal
> services up to the time of withdraw, and you hereby grant us
> a lien on your case in that amount.

The phrase "you hereby grant us a lien on your case in that amount" is clearly an equitable assignment of a portion of a

fund, rather than a mere promise to pay. It is not a personal promise on Mr. Goyal's part to pay an amount; rather, it is an assignment of a portion of any judgment Mr. Goyal receives as a result of his case against GTI.

It is noteworthy that the other provisions of the agreement do not give rise to an equitable lien. For example, the following provision is a mere promise to pay:

> In the event the firm withdraws because it believes your case would not result in a sustainable claim and/or collectible judgment or for any other reason, you agree to reimburse the firm all costs and expenses advanced on your behalf or obligated to pay on your behalf but no attorneys fees.

The language "you agree to reimburse the firm all costs and expenses" is a personal promise on Mr. Goyal's part to pay an amount, rather than an assignment of a portion of a fund. Therefore, in order to determine whether CDG's equitable lien is enforceable, the Court must determine whether CDG withdrew as a result of Mr. Goyal's conduct.

## II. Justification for CDG's Withdrawal from the Case

Although there is little case law on the subject, Illinois courts have occasionally addressed the circumstances under which an attorney's withdrawal from a case is justified. *See Kannewurf v. Johns*, 632 N.E.2d 711, 714 (Ill. App. Ct. 1994) (withdrawal justified based on client's refusal to negotiate towards settlement); *Leoris & Cohen, P.C. v. McNiece*, 589 N.E.2d 1060, 1065 (Ill. App. Ct. 1992) (withdrawal justified based on complete

12

breakdown in attorney-client relationship); *Reed Yates Farms, Inc. v. Yates*, 526 N.E.2d 1115, 1120-21 (Ill. App. Ct. 1988) (withdrawal justified based on client's failure to pay past-due retainer fees). Where an attorney's withdrawal from a case is for good cause, Illinois courts have held that the attorney is entitled to reasonable compensation for legal services rendered prior to the attorney's withdrawal. *Kannewurf*, 632 N.E.2d at 714; *Leoris & Cohen*, 589 N.E.2d at 1060; *Reed Yates Farms*, 525 N.E.2d at 1121.

In *Kannewurf*, the court held that the attorney was entitled to reasonable compensation for legal services rendered prior to withdrawal where the attorney's sole reason for withdrawing was his client's refusal to negotiate towards settlement in a manner the attorney thought best. *Kannewurf*, 632 N.E.2d at 714. In that case, the plaintiffs initially made a $300,000 settlement demand, which was the limit of the defendants' insurance policy. *Id.* at 713. During the course of negotiations, the defendants raised their settlement offer from $25,000 to $50,000. *Id.* Although the plaintiffs' attorney advised his clients that their case was worth between $75,000 and $100,000, the clients refused to lower their demand from the $300,000 policy limit. *Id.*

In holding that the attorney was justified in withdrawing, the *Kannewurf* court explained that the rules governing attorney conduct will occasionally be in conflict. *Id.* at 715. On the

one hand, the Illinois Rules of Professional Conduct require lawyers to "abide by a client's decisions concerning the objectives of representation"; to "consult with the client as to the means by which they are to be pursued"; and to "abide by his client's decisions to accept an offer of settlement of a matter." *Id.* (quoting Ill. Rules of Prof'l Conduct R. 1.2 (1990)). On the other hand, the rules provide that an attorney may withdraw from a case where the client, by his or her conduct, "renders it unreasonably difficult for the lawyer to carry out the employment effectively." *Id.* (quoting Ill. Rules of Prof'l Conduct R. 1.16(b)). In *Kannewurf*, the court reasoned that "[b]y making an unreasonable decision concerning the objectives of representation and how settlement negotiations were to occur, plaintiffs put [the attorney] in a position in which it became unreasonably difficult for him to carry out his employment effectively." *Id.* at 716.

Illinois courts have upheld an award of reasonable attorneys' fees upon an attorney's withdrawal in other circumstances. In *Leoris & Cohen*, in reversing summary judgment for the client, the court stated that the attorney would be entitled to attorneys' fees on a *quantum meruit* basis were it shown that the reason for the attorney's withdrawal was a complete breakdown in the attorney-client relationship. 589 N.E.2d at 1065; *see also Reed Yates Farms*, 526 N.E.2d at 1120-21

14

(holding that the attorney was entitled to attorneys fees on a *quantum meruit* basis where the reason for withdrawal was the client's failure to pay past-due retainer fees and his filing of a disciplinary action against the attorney).

Here, CDG argues that the equitable lien for reasonable attorneys' fees is enforceable because CDG withdrew as a result of Mr. Goyal's conduct. Specifically, CDG argues that Mr. Goyal unreasonably withheld his consent from settlement, made accusatory statements to CDG attorneys, and insisted on litigation strategies contrary to CDG's recommendations. CDG argues that Mr. Goyal's settlement objectives were unreasonable because Mr. Goyal calculated settlement demands based upon what he wanted "in my pocket," rather than the legal merit of his claims. In sum, CDG argues that Mr. Goyal's conduct resulted in conflicts between Mr. Goyal and his attorneys that necessitated CDG's withdrawal.

Indeed, the evidence supports CDG's interpretation of the events leading up to its withdrawal. A simple review of Mr. Goyal's settlement demands suggests unreasonableness: in February 2008, when CDG recommended a demand of $1 million, Mr. Goyal insisted on a $4 million demand; in October 2008, Mr. Goyal raised his demand to $4.6 million; in November 2008, soon after CDG had offered to reduce its fee in exchange for a settlement demand of $2.6 million, Mr. Goyal informed CDG that $4.6 million

was "at the low end of my expectation"; less than a week later, Mr. Goyal sent the "urgent" e-mail demanding that CDG submit a $5.5 million demand to GTI. Yet, in the end, despite his consistent history of high settlement demands, Mr. Goyal settled his case with GTI for $1.3 million.

Mr. Goyal argues that his settlement demands were reasonable and were consistent with CDG's valuation of the case. Mr. Goyal argues that he made his initial $4 million demand based upon CDG's February 19, 2008, e-mail in which it estimated that the most likely jury award in the case would be $2.25 million, while the best-case award would be $4.14 million. The evidence, however, tends to undermine Mr. Goyal's claim. In its February 19th e-mail, CDG stated that the best-case scenario was "not likely," and that the "uncertainty" of the most likely scenario was "still troubling." Furthermore, CDG recommended in the same e-mail that Mr. Goyal should be willing to settle the case for $1 million.

Mr. Goyal next argues that his $5.5 million dollar demand was reasonable because, by November 2008, Judge Pallmeyer had denied GTI's motion for summary judgment, "thus further strengthening the case." In addition, Mr. Goyal argues that CDG "repeatedly insisted that Mr. Goyal needed to allow room for negotiation." Finally, Mr. Goyal makes reference to his demand being "significantly lower" than the $10 million this Court

stated he could get.

Even if Mr. Goyal were correct that the summary judgment outcome strengthened his case, this alone does not render his history of growing settlement demands reasonable. Moreover, a client does not "allow room for negotiation" by adding $1.5 million to a $4 million settlement demand that had been rejected eight months earlier. Finally, this Court's comment, in response to Mr. Goyal's suggestion that a jury could award $10 million in a whistleblower case, was meant to emphasize the dramatic gamble parties take when they try a case to a jury; it was not meant to entice Mr. Goyal into making higher and higher settlement demands or to suggest in any way that his attorneys had undervalued his case.

Mr. Goyal's unreasonable settlement strategy resembles the clients' unreasonable conduct in *Kannewurf*. There, the clients refused to reduce their settlement demand from the $300,000 policy limit despite their attorney's insistence that the case was worth less; here, Mr. Goyal refused to reduce his settlement demand below $4 million despite CDG's recommendation that a lower settlement demand would be more effective. *See Kannewurf*, 632 N.E.2d at 713-14. Mr. Goyal's conduct here is arguably more egregious; not only did he refuse to lower his demand, but he kept increasing it.

Although CDG was required to "abide by [its] client's

decisions concerning the objectives of representation . . . [and to] abide by [its] client's decisions to accept an offer of settlement of a matter," Ill. Rules of Prof'l Conduct R. 1.2, in this case CDG was justified in withdrawing. By making it unreasonably difficult for CDG to negotiate towards settlement in a way he thought best, Mr. Goyal "render[ed] it unreasonably difficult for [CDG] to carry out the employment effectively." *See Kannewurf*, 632 N.E.2d at 715 (quoting Ill. Rules of Prof'l Conduct R. 1.16(b)). Therefore, CDG's equitable lien against Mr. Goyal's settlement with GTI is enforceable.

Mr. Goyal's arguments that CDG mismanaged the case and thereby decreased its value are irrelevant here and are unfounded in the evidence. During its representation of Mr. Goyal, CDG successfully defended against GTI's motion for summary judgment and obtained a settlement offer of $1 million from GTI, just $300,000 less than the amount Mr. Goyal settled for just over three months later. These results do not support a claim of mismanagement or malpractice.

## III. Reasonable Value of CDG's Legal Services

Because CDG withdrew from the case as a result of Mr. Goyal's conduct, the equitable-lien provision of CDG's fee agreement with Mr. Goyal becomes enforceable. The fee agreement provides that if CDG withdraws as a result of Mr. Goyal's conduct, Mr. Goyal will "reimburse all expenses and costs we have

18

advanced or obligated the firm to pay on your behalf, and . . .
pay for the reasonable value of our legal services up to the time
of withdraw."

Initially, the Court notes that the terms of the equitable-
lien provision state that CDG is entitled to reasonable
attorneys' fees, not to the twenty-five percent contingency fee
CDG would have gotten had it not withdrawn.  Nonetheless, CDG
first argues that the reasonable value of its legal services
prior to withdrawal is the twenty-five percent contingency fee.
CDG cites *Wegner v. Arnold*, 713 N.E.2d 247 (Ill. App. Ct. 1999),
where the court held that, where an attorney who had put much
work into a case was fired immediately before the client accepted
settlement, "the factors involved in determining a reasonable fee
would justify a finding that the entire contract fee is the
reasonable value of services rendered."  *Id.* at 250 (citing
*Rhoades v. Norfolk & W. Ry. Co.*, 399 N.E.2d 969, 975 (Ill.
1979)).  However, *Wegner* is inapplicable here because the
attorney there was discharged by his client, while CDG withdrew
from Mr. Goyal's case.  *See id.*  Furthermore, *Wenger* is the
exception to the general rule that a discharged attorney may only
recover attorneys' fees on a *quantum meruit* basis, *e.g., Rhoades*,
399 N.E.2d at 975, which is the rule that applies in cases of
attorney withdrawal.  *E.g., Kannewurf*, 632 N.E.2d at 715.

Furthermore, the balance of considerations here supports

19

allowing CDG to recover fees only on a *quantum meruit* basis.
Although clients in Illinois may discharge their attorneys at any
time, with or without cause, *Rhoades*, 399 N.E.2d at 974, an
attorney may only withdraw with cause and under very limited
circumstances. *See* Ill. Rules of Prof'l Conduct R. 1.16 (1990).
In the case of discharge, attorneys generally are limited to
recovery on a *quantum meruit* basis because permitting recovery of
the full contractual contingency fee would harm clients by making
their right to discharge meaningless, "since the client's
contractual financial responsibility to the discharged attorney
would be unchanged." *Rhoades*, 399 N.E.2d at 974. In the case of
withdrawal, permitting recovery of the full contractual
contingency fee would similarly harm clients, since it would give
attorneys an incentive to withdraw whenever the opportunity
arose. Denying CDG recovery of the full contractual contingency
fee discourages the undesirable exercise of attorneys' limited
right to withdraw.

On the other hand, permitting Mr. Goyal to pay no attorneys'
fees would also work an injustice. In that case, Mr. Goyal would
be unjustly enriched "by the value of the attorney's unpaid, but
reasonable, services." *Kannewurf*, 632 N.E.2d at 715 (citing
*Leoris & Cohen*, 589 N.E.2d at 1064). In sum, because permitting
CDG to recover the full contractual contingency fee would harm
clients by encouraging attorney withdrawal, and because

permitting Mr. Goyal to pay no attorneys' fees would result in his unjust enrichment, CDG is not entitled to the twenty-five percent contingency fee but to attorneys' fees on a *quantum meruit* basis, or "as much as [it] deserves." *See id.* at 715-17 (holding that an attorney who withdraws for good cause is entitled to recover on a *quantum meruit* basis, or "as much as he deserves").

CDG next argues that it is entitled to the reasonable value of services rendered prior to withdrawal on a *quantum meruit* basis. CDG's invoices billed to Mr. Goyal detail costs and fees totaling $300,615.85. Under Illinois law, "the trial judge has broad discretion in matters of attorney fees due to the advantage of close observation of the attorney's work and the trial judge's deeper understanding of the skill and time required in the case." *Kannewurf*, 632 N.E.2d at 716. In determining reasonable attorneys' fees, the judge is to assess several relevant factors, including "the time and labor required, the attorney's skill and understanding, the nature of the cause, the novelty and difficulty of the subject matter, the attorney's degree of responsibility in managing the case, the usual and customary charge for that type of work in the community, and the benefits resulting to the clients." *Id.* at 717 (citing *Lee v. Ingalls Mem'l Hosp.*, 597 N.E.2d 747 (Ill. App. Ct. 1992)).

Here, the parties disagree over what is a reasonable hourly

rate for the CDG attorneys. Notably, the parties' March 21, 2006, fee agreement states that the "current standard rate" for CDG attorney Christopher Mammel is between $275 and $300 per hour. However, CDG's invoices bill Mr. Mammel's time at a rate of $350 per hour for 1.75 hours and $425 per hour for 421.65 hours, for a total of $179,813.75. Based upon its evaluation of the factors relevant to determining reasonable attorneys' fees, this Court finds that CDG should recover attorneys' fees consistent with the rates outlined in its March 21, 2006, fee agreement with Mr. Goyal. Accordingly, the charges for Mr. Mammel's time will be calculated at $300 per hour, for a reduction in fees of $52,793.75. The other attorneys' hourly rates are consistent with the rates mentioned in the fee agreement.

Next, the Court notes that CDG's invoices to Mr. Goyal contain charges for expenses that fall under the category of general overhead. Illinois courts distinguish between general overhead expenses, which are not recoverable, and costs incurred in pursuit of specific litigation, which are recoverable. *See Johnson v. Thomas*, 794 N.E.2d 919, 934 (Ill. App. Ct. 2003) ("Generally overhead office expenses, namely expenses that an attorney regularly incurs regardless of specific litigation, including telephone charges, in-house delivery charges, in-house photocopying, check processing, newspaper subscriptions, and

in-house paralegal and secretarial assistance, are not recoverable as costs of litigation"). However, overhead expenses do not include special payments to third parties made in furtherance of a specific cause of action, including expenses for expert witnesses, special process servers, depositions, court reporters, filing fees, and outside messenger services. *Id.* at 934-35.

Here, there are several charges related to photocopying and filing, which are general overhead expenses not recoverable under Illinois law. There are charges totaling $4,087.50 marked "Document Reproduction (Internal)"; these are non-recoverable photocopying expenses. In addition, employee Renee Zarazinski spent a total of 6.5 hours photocopying documents and preparing a deposition exhibit notebook. Because this is clerical assistance, CDG is not entitled to recover the $812.50 charged for her work. Finally, there are a total of $1,045 in charges for the work of Mark Frazzetto and Ronald Rashid, who performed document scanning and coding. This is essentially computerized filing and is therefore not recoverable.

In addition, the charges for work performed by employee Trisha Delgado are problematic. Much of her work appears to be clerical in nature (phone calls to chambers and to other attorneys regarding the extension of deadlines, "preparation of correspondence" to clients and attorneys, compiling of documents

for depositions, etc.) and therefore is not recoverable. As a result, the Court will reduce the $17,850.50 charged for Tisha Delgado's work by half, or $8,925.25.

Finally, the charges for work performed by law students and law clerks present issues. Under Illinois law, work performed by senior law students and law clerks may be recoverable as reasonable attorneys' fees. *See Merch. Nat. Bank of Chicago v. Scanlon*, 408 N.E.2d 248, 254 (Ill. App. Ct. 1980) ("Unlike the work of secretaries and other supporting personnel, the work of senior law students is, in many instances, work of a kind necessary to the prosecution of the litigation which will, or ought to be performed, if not by them, by attorneys"). However, in order to be recoverable, work by law students or law clerks must have been legal work that "would have otherwise been performed by the attorneys." *Id.; see also Losurdo Bros. v. Arkin Distrib. Co.*, 465 N.E.2d 139, 145-46 (Ill. App. Ct. 1984)(holding that law clerk time spent delivering an amended complaint is not recoverable because not legal work).

Here, CDG's invoices include charges for work performed by law students or law clerks totaling $13,410. Much of the work performed by law clerks appears to be legal work that would otherwise have been performed by the attorneys and is, therefore, recoverable. For example, the typical law clerk entries are for conducting legal research and drafting motions. However, there

24

are significant charges for nonlegal work performed by law clerks.  Most notably, Alexander Sweis spent forty-one hours, totaling $4,300 in charges, "reviewing and pulling any documents related to John Riordan."  Based upon these considerations, the Court will reduce the charges for work performed by law clerks by one-third, or $4,465.

### Conclusion

The Court grants Childress Duffy Goldblatt, LTD.'s Motion to Enforce Equitable Lien and orders Anil Goyal to pay CDG $215,551.17[7] in fees and costs.


Dated: November 24, 2009

ENTER:


ARLANDER KEYS
United States Magistrate Judge

---

[7] This amount was calculated as follows: $300,615.85 (total charges) minus $72,129 (reduction in fees and costs ordered by the Court) minus $12,935.68 (amount Goyal had previously paid CDG).